**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 26 2011

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

WESTERN DIVISION

| | | |
|---|---|---|
| MACOMB COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | No.  **4 · 1 1 - C V - 0 3 6 3** BSM |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| | ) | |
| vs. | ) ) | |
| | ) | This case assigned to District Judge *Miller* |
| ACXIOM CORPORATION, JOHN A. MEYER, and CHRISTOPHER W. WOLF, | ) ) | and to Magistrate Judge *Young* |
| | ) | |
| Defendants. | ) ) | |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 (the "Exchange Act"). The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

2.      Venue is proper in this District pursuant to §27 of the Exchange Act. Many of the acts complained of herein occurred in this District and many of the false and misleading statements were disseminated within this District.

3.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## INTRODUCTION

4.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Acxiom Corporation ("ACXM" or "the Company") between October 27, 2010 and March 30, 2011, inclusive (the "Class Period"), against ACXM and certain of its officers and/or directors, for violations of the Exchange Act, 15 U.S.C. §§78a *et seq*. These claims are asserted against ACXM and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the Securities Exchange Commission ("SEC").

5.      ACXM describes itself as "a recognized leader in marketing technology and services that enable marketers to successfully manage audiences, personalized consumer experiences and create profitable customer relationships." During the Class Period, ACXM was looking to grow the Company both within the United States and internationally.

6.      As a result of defendants' false statements, ACXM's stock traded at artificially inflated prices during the Class Period, reaching a high of $18.64 per share on December 9, 2010.

7.     On March 30, ACXM abruptly announced that its Chief Executive Officer ("CEO") and President John A. Meyer ("Meyer") resigned effective March 28, 2011 and that its Chief Financial Officer ("CFO") Christopher W. Wolf ("Wolf") would also step down in the second calendar quarter of 2011.   Additionally, ACXM forecasted a weak fiscal fourth quarter, with adjusted earnings of $0.18 - $0.22 per share and revenue between $295 million and $299 million for the quarter ended March 31, 2011, compared to analyst forecasts of adjusted earnings of $0.24 per share and $303 million in revenue.   ACXM also announced that it "expects to record a non-cash impairment charge in the fourth quarter of fiscal 2011 in connection with a write-down of the carrying value of goodwill and other long-lived assets associated with its international operations."

8.     On this news, the price of ACXM's common stock plummeted *22.7%*, from a closing price of $17.46 on March 29, 2011, to close at $13.50 per share on March 30, 2011, on unusually heavy trading volume.

9.     The true facts, which were known by defendants but concealed from the investing public during the Class Period, were as follows:

(a)     that the Company was experiencing a significant decline in its international operations and was not operating according to plan;

(b)     that the Company failed to properly and timely account for impaired assets related to its international operations; and

(c)     as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.

10.    As a result of defendants' false statements and omissions, ACXM common stock traded at artificially inflated prices during the Class Period.   After the above revelations reached the

market, however, the Company's shares were hammered by massive sales, sending them down approximately *27.6%* from their Class Period high.

## PARTIES

11.     Plaintiff Macomb County Employees' Retirement System purchased ACXM common stock as described in the attached certification and was damaged thereby.

12.     As set forth above, defendant ACXM is a Delaware company with its principal executive offices located in Little Rock, Arkansas.

13.     Defendant Meyer, was the President, CEO, and a member of the Board of Directors of ACXM from the start of the Class Period until March 28, 2011 when he resigned his positions. The Company announced Meyer's resignation on March 30, 2011.

14.     Defendant Wolf is, and at all relevant times was, Executive Vice President and Chief Financial Officer ("CFO") of ACXM.

15.     Defendants Meyer and Wolf (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of ACXM's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

- 4 -

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

16.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about ACXM. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of ACXM common stock was a success, as it: (i) deceived the investing public regarding ACXM's prospects and business; (ii) artificially inflated the prices of ACXM common stock; and (iii) caused Plaintiff and other members of the Class to purchase ACXM common stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired ACXM common stock during the Class Period. Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. ACXM has more than 80 million shares of stock outstanding, owned by hundreds if not thousands of persons.

19.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the Exchange Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of ACXM common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

20.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from defendants' wrongful conduct.

21.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

22.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS
### BACKGROUND

23.     As stated above, ACXM, which was founded in 1969, describes itself as "a recognized leader in marketing technology and services that enable marketers to successfully manage audiences, personalized consumer experiences and create profitable customer relationships." The Company's client base includes Fortune 100 companies in the financial services, insurance, information services, direct marketing, media, retail, consumer packaged goods, technology, automotive, healthcare, travel and telecommunications industries.

24.     The Company's business segments consist of Information Services and Information

Products, which accounted for 77% and 23% of the ACXM's fiscal 2010 revenue, respectively.

Each of these two segments contains a U.S. and an International component.

**DEFENDANTS' FALSE AND MISLEADING
STATEMENTS ISSUED DURING THE CLASS PERIOD**

25.     The Class Period begins on October 27, 2010.  On that date, ACXM issued a press

release announcing its financial results for the second quarter of 2011.  The Company reported a

7.6% increase in revenue to $291.7 million, compared to the same quarter a year ago, and earnings

per diluted share of $0.16.  The press release as stated, in pertinent part:

> John Meyer, Acxiom's chief executive officer and president, said, "I am pleased that
> we have delivered another quarter of solid financial performance. We continue to see
> revenue growth as evidenced by the year-over-year revenue increase of almost eight
> percent. This translated into an impressive 29 percent increase in operating income
> over the second quarter of last year. In addition to executing in the near term, we
> invested in several projects that should provide for continued future growth."

26.     Following issuance of the press release on October 27, 2010, ACXM hosted a

conference call to discuss its second quarter 2011 financial results and operations. During the

conference call, defendants made numerous positive statements about the Company's business,

operations and prospects.

27.     On November 5, 2010, ACXM filed with the SEC its quarterly report on Form 10-Q

for the period ended September 30, 2010. The Company's Form 10-Q reiterated the Company's

financial results, was signed by Wolf, and contained required Sarbanes-Oxley ("SOX") certifications

signed by Meyer and Wolf stating that the Form 10-Q "does not contain any untrue statement of a

material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period

covered by this report." The Form 10-Q further discussed the Company's goodwill impairment

guidelines, and stated in part:

Goodwill is tested for impairment at the reporting unit level, which is defined as either an operating segment or one step below operating segment, known as a component. Acxiom's two segments as presented above are the Information Services segment and the Information Products segment. Because each of these segments contains both a US component and an International component, and there are some differences in economic characteristics between the US and International components, management has tested a total of four components. The goodwill amounts as of April 1, 2010 included in each component tested were US Information Services, $306.1 million; US Information Products, $51.2 million; International Information Services, $42.0 million; and International Information Products $71.0 million.

In order to estimate a valuation for each of the four components tested, management used an income approach based on a discounted cash flow model. Additionally, the analysis was enhanced to include a public company market multiple and a similar transactions comparison.

The income approach involves projecting cash flows for each component into the future and discounting these cash flows at an appropriate discount rate. Management used budget figures for the first year of the projection model, and then projected those figures out into the future years using management's best estimates of future revenue growth, operating margins, and other cash flow assumptions. The discount rates used for each component in order to arrive at an estimated fair value were estimated as a weighted-average cost of capital which a marketplace participant would use to value each unit. These weighted-average costs of capital rates include a market risk, added to a risk-free rate of return, and a size premium that is specific to the components being tested. The resulting cost of equity is then weighted-averaged with the after-tax cost of debt.

The public company market multiple method was used to estimate values for each of the components by looking at market value multiples to revenue and EBITDA for selected public companies that are believed to be representative of companies that marketplace participants would use to arrive at comparable multiples for the individual component being tested. These multiples are then used to develop a market value for that component.

The similar transactions method compared multiples based on acquisition prices of other companies believed to be those that marketplace participants would use to compare to the individual components being tested. Those multiples are then used to develop a market value for that component.

In order to arrive at an estimated value for each component, management used a weighted-average approach to combine the results of each analysis. Management believes that using multiple valuation approaches and then weighting them appropriately is a technique that a marketplace participant would use.

As a final test of the valuation results, the total of the values of the components was reconciled to the actual market value of Acxiom Corporation stock as of the April 1, 2010 valuation date. This reconciliation indicated an implied control premium. Management believes this control premium is reasonable compared to historical control premiums observed in actual transactions.

Each of the components tested had fair values in excess of the carrying value of the unit, indicating no impairment. All of the components had a significant excess fair value, except for the International Products component, for which the excess fair value was 12%. Management believes that the valuations arrived at are reasonable and consistent with what other marketplace participants would use in valuing the Company's components. However, management cannot give any assurance that market values will not change in the future. For example, if discount rates demanded by the market increase, this could lead to a reduction under the income approach. If the Company's projections are not achieved in the future, this could lead management to reassess their assumptions and lead to a reduction under the income approach. If the market price of the Company's stock decreases, this could cause the Company to reassess the reasonableness of the control premium, which might cause management to assume a higher discount rate under the income approach. If future similar transactions exhibit lower multiples than those observed in the past, this could lead to a reduction under the similar transactions approach. And finally, if there is a general decline in the stock market, and particularly in those companies selected as comparable to the Company's components, this could lead to a reduction under the public company market multiple approach. The Company's annual impairment test is performed during the first quarter of each fiscal year, however if there are further triggering events, the Company may be required to perform additional testing at other dates.

28.     On January 26, 2011, ACXM issued a press release announcing its financial results for the third quarter of 2011. The Company reported a 5.4% increase in revenue to $299.1 million and earnings per diluted share of $0.25, compared to $0.18 in the third quarter of 2010. The press release stated, in pertinent part:

> John Meyer, Acxiom's chief executive officer and president, said, "We are pleased that Acxiom delivered another solid performance in the third quarter of fiscal 2011. This represents our third consecutive quarter of year-over-year revenue and operating income growth. This quarter's performance was driven by the continued execution against our strategy and was aided by the general improvement in client spending in our core markets."

29.     Following issuance of the press release on January 26, 2011, ACXM hosted a conference call to discuss its third quarter 2011 financial results and operations. During the

conference call, defendants made numerous positive statements about the Company's business, operations and prospects. More specifically, Meyer discussed the Company's international operations, and stated in part:

> This quarter's revenue improvement was spread across the majority of our businesses and our vertical markets. While accounting for a small part of our overall part of our business, we saw phenomenal traction in our international business highlighted by China's 56% year over year, and return of the UK data revenue growth which grew to over 15% year over year.

30.    On February 4, 2011, ACXM filed with the SEC its quarterly report on Form 10-Q for the period ended December 31, 2010. The Company's Form 10-Q reiterated the Company's financial results, was signed by Wolf, and contained required Sarbanes-Oxley ("SOX") certifications signed by Meyer and Wolf stating that the Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The Form 10-Q further discussed the Company's goodwill impairment guidelines, and stated in part:

> Goodwill is tested for impairment at the reporting unit level, which is defined as either an operating segment or one step below operating segment, known as a component. Acxiom's two segments as presented above are the Information Services segment and the Information Products segment. Because each of these segments contains both a US component and an International component, and there are some differences in economic characteristics between the US and International components, management has tested a total of four components. The goodwill amounts as of April 1, 2010 included in each component tested were US Information Services, $306.1 million; US Information Products, $51.2 million; International Information Services, $42.0 million; and International Information Products $71.0 million.

> In order to estimate a valuation for each of the four components tested, management used an income approach based on a discounted cash flow model. Additionally, the analysis was enhanced to include a public company market multiple and a similar transactions comparison.

> The income approach involves projecting cash flows for each component into the future and discounting these cash flows at an appropriate discount rate. Management

- 10 -

used budget figures for the first year of the projection model, and then projected those figures out into the future years using management's best estimates of future revenue growth, operating margins, and other cash flow assumptions. The discount rates used for each component in order to arrive at an estimated fair value were estimated as a weighted-average cost of capital which a marketplace participant would use to value each unit. These weighted-average costs of capital rates include a market risk, added to a risk-free rate of return, and a size premium that is specific to the components being tested. The resulting cost of equity is then weighted-averaged with the after-tax cost of debt.

The public company market multiple method was used to estimate values for each of the components by looking at market value multiples to revenue and EBITDA for selected public companies that are believed to be representative of companies that marketplace participants would use to arrive at comparable multiples for the individual component being tested. These multiples are then used to develop a market value for that component.

The similar transactions method compared multiples based on acquisition prices of other companies believed to be those that marketplace participants would use to compare to the individual components being tested. Those multiples are then used to develop a market value for that component.

In order to arrive at an estimated value for each component, management used a weighted-average approach to combine the results of each analysis. Management believes that using multiple valuation approaches and then weighting them appropriately is a technique that a marketplace participant would use.

As a final test of the valuation results, the total of the values of the components was reconciled to the actual market value of Acxiom Corporation stock as of the April 1, 2010 valuation date. This reconciliation indicated an implied control premium. Management believes this control premium is reasonable compared to historical control premiums observed in actual transactions.

Each of the components tested had fair values in excess of the carrying value of the unit, indicating no impairment. All of the components had a significant excess fair value, except for the International Products component, for which the excess fair value was 12%. Management believes that the valuations arrived at are reasonable and consistent with what other marketplace participants would use in valuing the Company's components. However, management cannot give any assurance that market values will not change in the future. For example, an increase in discount rates demanded by the market could lead to a valuation reduction under the income approach. If the Company's projections are not achieved in the future, this could lead management to reassess their assumptions and lead to a reduction under the income approach. If the market price of the Company's stock decreases, this could cause the Company to reassess the reasonableness of the control premium, which might cause management to assume a higher discount rate under the income approach. If future similar transactions exhibit lower multiples than those observed

in the past, this could lead to a reduction under the similar transactions approach. And finally, if there is a general decline in the stock market, and particularly in those companies selected as comparable to the Company's components, this could lead to a reduction under the public company market multiple approach. The Company's annual impairment test is performed during the first quarter of each fiscal year, however if there are further triggering events, the Company may be required to perform additional testing at other dates.

31.    On March 30, 2011, ACXM issued a press release announcing the resignation of

President, CEO, and member of the Board of Directors Meyer, effective March 28, 2011. The

Company also announced that CFO Wolf intended to resign during the second calendar quarter of

2011. Finally, the Company reported that it intended to record a non-cash impairment charge in the

fourth quarter of 2011. The press release further stated, in relevant part:

> The company also announced that it expects to record a non-cash impairment charge in the fourth quarter of fiscal 2011 in connection with a write-down of the carrying value of goodwill and other long-lived assets associated with its international operations. As a result of recent performance of the international operations and management's evaluation of those businesses, indicators arose during the fourth quarter requiring the company to accelerate the process to review goodwill and other long-lived assets. The goodwill associated with the international components, as of December 31, 2010, was approximately $130 million. Due to the complexity of the calculation process, and the need for appraisals and analyses that have not yet been obtained and performed, the company is currently unable to estimate with precision the amount of the impairment charges. However, the company currently estimates that these amounts will be between $50 million and $90 million.

> The company expects to include the actual amount of the impairment charge when it announces its fourth quarter and fiscal year 2011 financial results. The actual amount of the impairment charge will affect the reported amounts of operating income, net income and diluted earnings per share, but will not affect cash balances or cash provided by operating activities.

32.    On the same day, the Company also announced that it was reducing its forecast for

the fourth quarter and fiscal year ending March 31, 2011. The press release further stated, as

follows:

> Based on currently available information, the company announced the following estimates for the fourth quarter and fiscal year ending March 31, 2011:

- Revenue is estimated to be in the range of $295 million to $299 million for the fourth quarter and $1.156 billion to $1.160 billion for fiscal year 2011.

- Earnings per diluted share attributable to Acxiom stockholders, excluding unusual items, are estimated to be in the range of $0.18 to $0.22 for the fourth quarter and $0.65 to $0.69 for fiscal year 2011.

- Earnings (loss) per diluted share attributable to Acxiom stockholders presented in accordance with generally accepted accounting principles are estimated to be in the range of ($1.03) to ($0.49) for the fourth quarter and( $0.49) to $0.05 for fiscal year 2011.

In addition to the estimate of the goodwill impairment charge, unusual items in the fourth quarter will include other restructuring and impairment charges in both the U.S. and international operations. A reconciliation of these estimates to the company's estimates of earnings per diluted share attributable to Acxiom stockholders presented in accordance with generally accepted accounting principles is attached to this press release.

33.    Following issuance of the press release on March 30, 2011, ACXM hosted a

conference call to discuss its fourth quarter 2011 financial results and operations.

34.    In response to the negative news, the price of ACXM stock plummeted $3.96, or

22.7% per share, on March 30, 2011, to close at $13.50 per share, on unusually heavy trading

volume.

35.    The following day, on March 31, 2011, analysts at Piper Jaffray cut their price target

on share of ACXM common stock from $15.00 to $12.00 per share.

36.    The true facts, which were known by defendants but concealed from the investing

public during the Class Period, were as follows:

(a)    that the Company was experiencing a significant decline in its international

operations and was not operating according to plan;

(b)    that the Company failed to properly and timely account for impaired assets

related to its international operations; and

(c)     as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.

37.     As a result of defendants' false statements and omissions, ACXM common stock traded at artificially inflated prices during the Class Period. After the above revelations were revealed to the market, however, the Company's shares were hammered by massive sales, sending them down approximately *27.6%* from their Class Period high.

## ADDITIONAL SCIENTER ALLEGATIONS

38.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding ACXM, their control over, and/or receipt and/or modification of ACXM allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning ACXM, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

39.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of ACXM common stock and operated as a fraud or deceit on Class Period purchasers of ACXM common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market

through partial disclosures, the price of ACXM common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of ACXM common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth about ACXM was revealed through a series of partial disclosures that removed the artificial inflation from the price of ACXM common stock.

40.     By failing to disclose to investors the adverse facts detailed herein, defendants presented a misleading picture of ACXM's business and prospects. Defendants' false and misleading statements had the intended effect and caused ACXM common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $18.64 per share on December 9, 2010.

41.     As a direct result of the disclosure on March 30, 2011, ACXM common stock fell precipitously. This drop removed the artificial inflation from the price of ACXM common stock, causing real economic loss to investors who had purchased ACXM common stock at artificially inflated prices during the Class Period.

42.     The decline was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline in ACXM common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of ACXM common stock and the subsequent significant decline in the value of ACXM common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

43.     At all relevant times, the market for ACXM common stock was an efficient market for the following reasons, among others:

(a)     ACXM common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, ACXM filed periodic public reports with the SEC and the NASDAQ;

(c)     ACXM regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     ACXM was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

44.     As a result of the foregoing, the market for ACXM common stock promptly digested current information regarding ACXM from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of ACXM common stock during the Class Period suffered similar injury through their purchase of ACXM common stock at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

45.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ACXM who knew that those statements were false when made.

**COUNT I**

**FOR VIOLATION OF §10(B) OF THE EXCHANGE ACT AND RULE 10B-5
AGAINST ALL DEFENDANTS**

46.     Plaintiff incorporates ¶¶1-45 by reference.

47.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of ACXM common stock during the Class Period.

49.     By virtue of the foregoing, ACXM and the Individual Defendants have each violated §10b of the Exchange Act, and Rule 10b-5 promulgated thereunder.

50.     As a direct result and proximate result of defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of ACXM stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for ACXM common stock and experienced loses when the artificial inflation was released from ACXM stock as a result of the partial revelations and stock price decline detailed herein.  Plaintiff and the Class would not have purchased ACXM common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### FOR VIOLATION OF §20(A) OF THE EXCHANGE ACT
### AGAINST INDIVIDUAL DEFENDANTS

51.     Plaintiff incorporates ¶¶1-45 by reference.

52.     The Individual Defendants acted as controlling persons of ACXM within the meaning of §20(a) of the Exchange Act.  By reason of their controlling positions with the Company, the Individual Defendants had the power and authority to cause ACXM to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

(a)     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b)     Awarding Plaintiff and the members of the Class damages, including interest;

(c)     Awarding Plaintiff reasonable costs and attorneys' fees; and

(d)     Awarding such equitable/injunctive or other relief as the Court may deem just

and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: April 26, 2011               CARNEY WILLIAMS BATES BOZEMAN
                                    & PULLIAM, PLLC


                                    _____
                                          RANDALL K. PULLIAM

                                    RANDALL K. PULLIAM
                                    11311 Arcade Drive, Suite 200
                                    Little Rock, AR  72212
                                    Telephone: 501/312-8500
                                    501/312-8505 (fax)

                                    ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                    DAVID J. GEORGE
                                    ROBERT J. ROBBINS
                                    120 E. Palmetto Park Road, Suite 500
                                    Boca Raton, FL  33432
                                    Telephone: 561/750-3000
                                    561/750-3364 (fax)

                                    VANOVERBEKE MICHAUD
                                        & TIMMONY, P.C.
                                    THOMAS C. MICHAUD
                                    79 Alfred Street
                                    Detroit, MI  48201
                                    Telephone: 313/578-1200
                                    313/578-1201 (fax)

                                    *Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

MACOMB COUNTY EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Coyne, et al. v. General Electric Company, et al.*, No. 3:08-cv-01135-SRU (D. Conn.)
*National Junior Baseball League v. PharmaNet Development Group, et al.*, No. 3:08-cv-05723-FLW-TJB (D.N.J.)

(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Washtenaw County Employees' Retirement System v. The Talbots, Inc., et al.*, No. 1:11-cv-10186-NMG (D. Mass.)

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Macomb County Employees' Retirement System v. Massey Energy Company, et al.*, No. 10-cv-0689-ICB (S.D. Wv.)
*Bach, et al. v. Amedisys, Inc., et al.*, No. 3:10:cv-00395-BAJ-CN (M.D. La.)

ACXIOM

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this *21st* day of *April*, 2011.

MACOMB COUNTY EMPLOYEES'
RETIREMENT SYSTEM

By: *Kathy N Vosburg*

Its: *CHAIR*

- 2 -

ACXIOM

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 11/23/2010 | 1,200 | $16.75 |
| 11/29/2010 | 300 | $16.97 |
| 11/30/2010 | 200 | $17.00 |
| 01/11/2011 | 500 | $17.16 |
| 01/11/2011 | 700 | $17.13 |
| 01/11/2011 | 1,200 | $17.16 |
| 01/12/2011 | 100 | $17.60 |
| 01/12/2011 | 500 | $17.60 |
| 01/13/2011 | 300 | $17.75 |
| 01/13/2011 | 700 | $17.75 |
| 01/18/2011 | 300 | $18.27 |
| 01/18/2011 | 800 | $18.27 |
| 01/19/2011 | 100 | $18.56 |
| 01/19/2011 | 200 | $18.56 |
| 02/01/2011 | 1,200 | $17.41 |
| 02/01/2011 | 2,800 | $17.41 |